Cesar A. **PERALES,** as Commissioner of the New York State Department of Social Services; New York State Department of Social Services; Robert Abrams, as Attorney General of the State of New York, and on behalf of the People of the State of New York; State of New York; City of New York; Sara Doe; Jane Roe; Anne Coe, individually and on behalf of their minor children, and on behalf of all others similarly situated and their minor children, Plaintiffs–Appellants,

Fran Foe; Mary Moe; Linda Loe; Susan Soe; Zelda Zoe, individually and on behalf of their minor children, and on behalf of all others similarly situated and their minor children, Plaintiffs–Intervenors–Appellants,

v.

Richard L. **THORNBURGH,** as Attorney General of the United States; Terrance O'Reilly, as Assistant Commissioner of the Immigration and Naturalization Service; Edward Wildblood, as Legalization Director of the INS Eastern Re-

gional Office; Gilbert Tabor, as INS Eastern Regional Processing Facility Director; Scott Blackman, as INS District Director of the New York District; Louis W. Sullivan, M.D., as Secretary of Health and Human Services, Defendants–Appellees.

Nos. 253 to 255, Dockets 91–6133, 91–6135 and 91–6167.

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1991.

Decided June 24, 1992.

Stephen Loffredo, Main Street Legal Services Inc., Flushing, N.Y.; Victor Kovner, Corp. Counsel to the City of New York, Ellen B. Fishman, Linda H. Young, Robert Abrams, Atty. Gen., State of N.Y., New York City, O. Peter Sherwood, Sol. Gen., Judith Kramer, Charles F. Sanders, New York City, for plaintiffs-appellants.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., Diogenes P. Kekatos, Marla Alhadeff, Asst. U.S. Attys., New York City, of counsel, for defendants-appellees.

Lucas Guttentag, Linda Bosniak, American Civ. Liberties Union, New York City, Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon & Rubin, Pauline Gee, Stephen A. Rosenbaum, California Rural Legal Assistance, San Francisco, Cal., Vibiana Andrade, Mexican American Legal Defense & Education Fund, Los Angeles, Cal., for Amici Curiae American Civ. Liberties Union, American Council of Nationality Services, Anna R., Sofia Baez Dehuerta, Jane S., Catholic Charities, Archdiocese of New York, Office for Immigrant Services, Travelers Aid Service/Victim Services Agency, Asian American Legal Defense and Education Fund, League of United Latin American Citizens, Nat. Coalition for Haitian Refugees, New York Immigration Coalition, Central American Refugee Center, Church Avenue Merchants Block Ass'n, Washington Ass'n of Churches.

Before: CARDAMONE, WALKER, and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge:

This case concerns the amnesty program of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359 *et seq.* Plaintiffs-appellants ("plaintiffs") challenge Immigration and Naturalization Service ("INS") regulations implementing the statutory exclusion of aliens "likely at any time to become a public charge." *See* 8 U.S.C. § 1182(a)(4) (Supp. II 1990). Plaintiffs claim that the regulations violated IRCA by disqualifying self-supporting aliens whose family members received public assistance. While the INS later revised its regulations to address plaintiffs' concerns, plaintiffs' maintain that prior to this revision the regulations deterred qualified aliens from applying, thereby denying them the full statutory application period. They further claim that the agency failed to "broadly disseminate information" regarding the revisions as required by statute. *See* 8 U.S.C. § 1255a(i) (1988). The United States District Court for the Southern District of New York (Conboy, J.), found the INS public charge regulations consistent with IRCA, and dismissed plaintiffs' complaint. We reverse the ruling of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

The Immigration Reform and Control Act's Amnesty Program.

By the 1980's, Congress faced a serious dilemma in immigration policy. A multitude of aliens had illegally entered the United States and settled here, causing damage to domestic labor, the economy, and to the opportunities of those seeking to lawfully cross our borders. *See* H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 52, *reprinted in* 1986 U.S.Code Cong. & Admin. News 5,649, 5,656. However, the cost and difficulty of removing these illegal aliens made their deportation a practical impossibility. *Id.* at 49, *reprinted in* 1986 U.S.Code Cong. & Admin. News 5,649, 5,653. Moreover, Congress recognized that many illegal aliens had over time made significant contributions to the nation, and that our own past failures in enforcement were in part responsible for the surge in illegal immigration. *Id.*

IRCA provided a compromise solution. It undercut the incentives for illegal immigration by sanctioning employers who hire undocumented workers. At the same time, IRCA offered amnesty to undocumented aliens who, over the years, had shown their capacity to be contributing members of society. This case concerns the INS' implementation of the amnesty program.

### A. *The Amnesty Provisions.*

Amnesty was to take place in two stages. During a twelve-month period beginning "on a date ... designated by the Attorney General" and later established by regulation as May 5, 1987 through May 4, 1988 (the "application period"), illegal aliens could apply to the INS for temporary resident status. 8 U.S.C. § 1255a(a)(1) (1988). The second stage, to commence nineteen months after the receipt of temporary resident status, gave aliens one year, later extended to two, *see* Pub.L. No. 101–649, § 703(a), 104 Stat. 5086 (1990), in which to apply for permanent resident status. 8 U.S.C. § 1255a(b)(1)(A), (2)(C) (1988 & Supp. II 1990). Aliens could tender their applications to the INS or to Qualified Designated Entities ("QDEs"), nongovern-

mental agencies enlisted to serve as "buffers" between aliens and the government. *See* 8 U.S.C. § 1255a(c)(1) (1988). IRCA further required the INS, in conjunction with the QDEs, to "broadly disseminate information respecting the benefits which aliens may receive under this section and the requirements to obtain such benefits." 8 U.S.C. § 1255a(i) (1988).

IRCA conditioned adjustment to temporary resident status on the meeting of four broad eligibility requirements. Sections 1255a(a)(1)–(4) mandated the Attorney General to grant this adjustment of status where the applicant: (1) had filed a timely application; (2) had maintained continuous unlawful residence since 1982; (3) had maintained a continuous physical presence since November 6, 1986; and (4) was "admissible to the United States as an immigrant." 8 U.S.C. § 1255a(a)(1)–(4) (1988).

The current appeal centers on the fourth criterion: admissibility as an immigrant. To show that she was "admissible ... as an immigrant," 8 U.S.C. § 1255a(a)(4) (1988), an alien had to establish, *inter alia,* that she was not inadmissible under 8 U.S.C. § 1182(a)(4) (Supp. II 1990) pursuant to which "[a]ny alien who, in the opinion of the ... Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable." IRCA's "Special Rule for Determination of Public Charge" (the "statutory special rule") limited the agency's broad discretion in this area, stating that an alien "is not ineligible for adjustment of status under this section due to being inadmissible under section 1182(a)(4) of this title [relating to the public charge determination] if the alien demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 8 U.S.C. § 1255a(d)(2)(B)(iii) (Supp. II 1990). In a separate provision, IRCA authorized the Attorney General to waive "in the case of individual aliens" any of the excludability provisions of § 1182(a), including the public charge provision, "for humanitarian purposes, to assure family unity, or when it

is otherwise in the public interest." 8 U.S.C. § 1255a(d)(2)(B)(i).

### B. *The INS' May 1, 1987 Public Charge Regulations.*

Pursuant to these provisions, the INS promulgated final regulations on May 1, 1987, 52 Fed.Reg. 16,205 *et seq.* (1987) (codified as amended at 8 C.F.R. § 245a (1992)). The INS broke the statutory amnesty scheme down into three parts. First, the agency's "Proof of financial responsibility" regulation mirrored the statutory language by providing that "[a]n applicant for adjustment of status ... [is] likely to become [a] public charge[ ] unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 52 Fed.Reg. 16,211 (1987) (codified as amended at 8 C.F.R. § 245a.2(d)(4) (1992)).[1] Integral to this provision was the regulation's definition of "public cash assistance" as "income or needs-based monetary assist-

ance ... received by the alien or his or her immediate family members through federal, state or local programs designed to meet subsistence levels." 52 Fed.Reg. 16,-209 (1987) (codified as amended at 8 C.F.R. § 245a.1(i) (1992)).[2] The third element, entitled "Special Rule for Determination of Public Charge" (the "regulatory special rule") provided in relevant part that "[a]n alien who has a consistent employment history which shows the ability to support himself and his or her family ... may be admissible" through a discretionary waiver from the Attorney General. 52 Fed.Reg. 16,212 (1987) (codified as amended at 8 C.F.R. § 245a.2(k)(4) (1992)).[3]

### C. *Developments in INS Policy.*

Prior to the issuance of the May 1, 1987 regulations, groups representing aliens had commented that the proposed public charge regulations unlawfully conditioned a showing of self-support upon the non-receipt of public assistance by family members. Just

1. The provision stated:

   (4) Proof of financial responsibility. An applicant for adjustment of status under this part is subject to the provisions of section 212(a)(15) of the Act relating to excludability of aliens likely to become public charges unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance. Generally, the evidence of employment submitted under paragraph (d)(3)(i) of this section will serve to demonstrate the alien's financial responsibility during the documented period(s) of employment. If the alien's period(s) of residence in the United States include significant gaps in employment or if there is reason to believe that the alien may have received public assistance while employed, the alien may be required to provide proof that he or she has not received public cash assistance. An applicant for residence who is likely to become a public charge will be denied adjustment.

2. This provision stated in full:

   "Public cash assistance" means income or needs-based monetary assistance, to include but not limited to supplemental security income, received by the alien or his or her immediate family members through federal, state, or local programs designed to meet subsistence levels. It does not include assistance in kind, such as food stamps, public housing, or other non-cash benefits, nor does it include work-related compensation or certain types of medical assistance (Medicare, Medicaid,

   emergency treatment, services to pregnant women or children under 18 years of age, or treatment in the interest of public health). 52 Fed.Reg. 16209 (1987).

3. The regulatory special rule provides that:

   (4) *Special rule for determination of public charge.* An alien who has a consistent employment history which shows the ability to support himself and his or her family, even though his income may be below the poverty level, may be admissible under paragraph (k)(2) of this section [providing for waivers for humanitarian purposes, to assure family unity, or when in the public interest]. The alien's employment history need not be continuous in that it is uninterrupted. It should be continuous in the sense that the alien shall be regularly attached to the workforce, has an income over a substantial period of the applicable time, and has demonstrated the capacity to exist on his or her income and maintain his or her family without recourse to public cash assistance. This regulation is prospective in that the Service shall determine, based on the alien's history, whether he or she is likely to become a public charge. Past acceptance of public cash assistance within a history of consistent employment will enter into this decision. The weight given in considering applicability of the public charge provisions will depend on many factors, but the length of time an applicant has received public cash assistance will constitute a significant factor. 52 Fed.Reg. 16,212 (1987).

over four months into the application period, the INS began a series of "clarifications" and amendments of the public charge provisions. A September 23, 1987 memorandum from Associate Commissioner Norton to the four regional commissioners removed the regulatory special rule's waiver requirement, stating that "[n]o waiver application is necessary to apply the special rule for determination of public charge." Commissioner Norton repeated this instruction in an October 1, 1987 letter to Edward J. Wildblood, the Regional Legalization Officer of the Eastern Regional Office. On November 17, 1987, the INS formalized this policy, issuing a technical amendment that deleted the waiver requirement from its special rule. 52 Fed. Reg. 43,843 (Nov. 17, 1987) (codified at 8 C.F.R. § 245a.2(k)(4) (1992)).

The INS also revised its definition of "public cash assistance." A November 23, 1987 memorandum from Commissioner Norton to the four regional commissioners explained that "SSI [Supplemental Security Income] should be considered as public cash assistance only with regard to the person who receives it. SSI should not be attributed as public cash assistance to the immediate family members who reside with the recipient, but who themselves are non-recipients." The agency's position with respect to Aid to Families with Dependent Children (AFDC) developed more slowly. A December 9, 1987 memorandum from Paul Virtue, INS General Counsel, to Terry O'Reilly, Deputy Assistant Commissioner for Legalization, explained that

> if a family of three applied for AFDC and the parents were both ineligible aliens the benefit would still be granted to the United States Citizen child and that the child is considered the recipient.... For our purposes, it would seem to me that the parents in such a situation would not be considered to have received "public cash assistance".

In a February 12, 1988 letter responding to questions from a District of Columbia Official, Assistant Commissioner William Slattery indicated that "[p]ublic charge status is not conveyed to the parent-payee if the United States citizen child is the recipient

[of AFDC]." Finally, on April 21, 1988, just two weeks before the close of the application period, Commissioner Norton adopted this position in a memorandum to the four Regional Commissioners:

> As a general rule, the receipt of AFDC benefits by a member of the legalization applicant's family is not attributed to the applicant for purposes of determining the likelihood that the applicant will become a public charge.... If, however, the family is reliant on the AFDC benefits as its sole means of support, the legalization applicant may be considered to have received public cash assistance. This determination must be made on a case-by-case basis and upon consideration of the totality of the applicant's circumstances.

Following the May 4, 1988 close of the application period, in a written decision dated December 29, 1988, Commissioner Norton broadened the April 21, 1988 position. He held that even a non-working applicant whose children had received public cash assistance would not be excludable as likely to become a public charge, since

> [i]t is not unusual for a mother to stay at home to care for her children, especially when the children have not started school. A mother's absence from the work force to care for her children is not by itself sufficient basis to find the mother likely to become a public charge.

*Matter of A.*, Interim Decision No. 3097 at 4 (Imm. Nat. Serv. Dec. 29, 1988). Finally, in July of 1989, more than one year after the May 5, 1988 application cutoff date, the INS formally amended its regulatory definition of "public cash assistance" to delete all reference to the alien's immediate family members. The Federal Register notice explained that "[t]he receipt of public cash assistance by immediate family members will not have a bearing on an applicant's eligibility for legalization." 54 Fed.Reg. 29,442, 29,443 (1989).

The July 1989 amendments also removed from the regulatory special rule references to an alien applicant's family. From that point on "an applicant need[ed] only [to] demonstrate a consistent employment his-

tory that shows the ability to support himself or herself." *Id.* at 29,443–44.

Prior Stages of This Lawsuit.

The prior history of this lawsuit bears on our disposition of this appeal, and thus merits some discussion. On April 1, 1988, approximately one month before the end of the application period, plaintiffs filed their complaint. They asserted, first, that the INS public charge regulations were facially invalid since they included consideration of public assistance by an alien's family members in the finding as to whether the alien herself was self-supporting. Plaintiffs further alleged that the INS had failed to "broadly disseminate", as required by statute, its policy statements and regulatory amendments revising the public charge regulations. *See* 8 U.S.C. § 1255a(i) (1988). The class of nongovernmental plaintiffs, as later certified, consisted of

> [a]ll undocumented aliens residing in New York State who may be excludable from the Legalization Program established by IRCA as "likely to become public charges" under the standards set forth in INS regulations 8 C.F.R. §§ 245a.1(i), 245a.2(d)(4) and 245a.2(k)(4) based in whole or in part upon the receipt of public cash assistance by the applicant's U.S. citizen or legal permanent resident family members, including but not limited to those individuals who were deterred from filing applications for legalization under the Legalization program.

These plaintiffs sought a declaration as to the unlawfulness of the regulations and the dissemination effort. They further sought an order requiring defendants to readjudicate, without reference to family members' receipt of public assistance, all applications of class members denied on public charge grounds and requiring the agency to accept applications for a period of one year from those class members whom the unlawful regulations had deterred from filing.

In early April, 1988, plaintiffs applied for a temporary restraining order directing the INS to disseminate its revised policy that a child's receipt of public cash assistance does not convey public charge status to the parent. In response, the INS represented to the district court that it would issue instructions to this effect to all regional and district legalization offices, and to all approved QDEs who were assisting the INS in the legalization process. The district court thereupon denied the application. Commissioner Norton issued the stated instructions in the April 21, 1988 memorandum to the four regional commissioners, referenced earlier. Plaintiffs, arguing that the clarification came too late to benefit those class members deterred from applying, moved for a preliminary injunction. The district court denied the motion, but on May 4, 1988 we granted plaintiff's motion for a temporary injunction and ordered the INS to accept applications accompanied by the statutory fee, a·number of which were filed. On May 18, 1988 four aliens who had applied during this period moved to intervene. On May 19, 1988, we affirmed the district court's denial of the preliminary injunction, and dissolved our temporary injunction. *Perales v. Meese*, 847 F.2d 55 (2d Cir.1988) (per curiam). The INS has yet to adjudicate the amnesty applications tendered while the temporary injunction was in effect.

On June 28, 1988, plaintiffs moved for partial summary judgment and the agency cross-moved. The district court, in an opinion dated March 29, 1989, granted plaintiffs' motions for intervention and class certification, but denied summary judgment motions to both sides. Plaintiffs moved for reargument on the facial invalidity of the challenged regulations. The parties settled this motion by a Stipulation and Order, filed July 21, 1989, which required defendants: (1) to publish amended regulations deleting the references to family members from the definition of public cash assistance and from the regulatory special rule; and (2) to reopen all timely filed applications that had been denied on public charge grounds and to readjudicate them in accordance with the amended regulations. The INS thereupon issued the July 1989 amendments discussed above. Upon readjudication, the INS approved all but one of the applications previously denied on public charge grounds.

The district court then held a six-day bench trial during which plaintiffs put in testimony from aliens, QDE representatives and immigrant advocates. INS officials also testified. The findings of the district court, as well as excerpts from the trial transcript, are reported in a thoughtful thirty-three page opinion at 762 F.Supp. 1036 (S.D.N.Y.1991). In conclusion, the district court determined that the INS public charge regulations were neither facially invalid nor unlawful as applied. It further held that, even if plaintiffs had succeeded on the merits, under *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), a federal court would not have authority to compel the INS to open the application period to plaintiffs. This appeal followed.

### DISCUSSION

I. Subject Matter Jurisdiction.

At the outset, we must decide whether we have subject matter jurisdiction in this case. In a letter to the district court, defendants originally conceded subject matter jurisdiction. However, shortly after oral argument on appeal, they raised the issue anew in light of the D.C. Circuit's recent opinion in *Ayuda v. Thornburgh*, 948 F.2d 742 (D.C.Cir.1991). Plaintiffs contend that defendants' concession of jurisdiction forecloses its reconsideration.

The limited jurisdiction of federal courts is derived from the Constitution and the Congress, not from the consent of the parties. Therefore, a party cannot waive lack of subject matter jurisdiction, *see, e.g., Reale Intern., Inc. v. Federal Republic of Nigeria*, 647 F.2d 330, 331 (2d Cir.1981), and the issue must be considered.

Federal question jurisdiction pursuant to 28 U.S.C. § 1331 would ordinarily cover the statutory and constitutional claims before us. *See, e.g., Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir.1991); *Johnsrud v. Carter*, 620 F.2d 29, 31–32 (3d Cir.1980). Defendants, however, urge that the IRCA's judicial review provisions are exclusive and deprive us of jurisdiction. *See* 8 U.S.C. § 1255a(f)(1)–(4) (1988). At the outset, we

note the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action." *McNary v. Haitian Refugee Center, Inc.*, — U.S. —, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991); *see also Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986) ("[f]rom the beginning 'our cases [have established] that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'") (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).

The relevant review procedures set forth in § 1255a(f)(1)–(4) are as follows:

(1) **Administrative and judicial review**

There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

(2) **No review for late filings**

No denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States or of any State or reviewed in any administrative proceeding of the United States Government.

(3) **Administrative review**

(A) **Single level of administrative appellate review**

The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of a determination described paragraph (1).

(B) **Standard for review**

Such administrative appellate review shall be based solely upon the administrative record established at the time of the determination on the application and upon such additional or newly discovered evidence as may not have been available at the time of the determination.

**(4) Judicial review**

**(A) Limitation to review of deportation**

There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title.

**(B) Standard for judicial review**

Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

A. *Do §§ 1255a(f)(1), (3) and (4) deprive this court of jurisdiction?*

■ The Supreme Court in *McNary, supra,* held that provisions codified at 8 U.S.C. §§ 1160(e)(1)–(3), which are identical to § 1255a(f)(1), (3) and (4) and govern judicial review of IRCA's Special Agricultural Worker (SAW) program, applied "only to review of denials of individual ... applications" and not to "challenges to the procedures used by INS." *McNary,* 111 S.Ct. at 897. Each of the Court's reasons apply with equal force to §§ 1255a(f)(1), (3) and (4). The reference in § 1255a(f)(1) to "a determination" and in § 1255a(f)(4) to "a denial" limit the scope of these provisions to "single" application determinations and do not cover challenges to an INS "practice or procedure." *McNary,* 111 S.Ct. at 896. Section 1255a(f)(4)'s requirement that judicial review be "based solely on the administrative record" under an "abuse of discretion" standard is inappropriate for review of statutory or constitutional claims which are generally reviewed *de novo* by the courts. *Id.* at 896–97. Finally, if "Congress [had] intended the limited review provisions of ... the INA to encompass challenges to INS procedures and practices, it could easily have used broader statutory language." *Id.* at 897. Accordingly, *McNary* compels the conclusion that §§ 1255a(f)(1), (3) and (4) do not apply to the present challenge to INS procedures.

*Accord Catholic Social Services v. Thornburgh,* 956 F.2d 914, 921 (9th Cir.), *cert. granted sub nom. Barr v. Catholic Social Services, Inc.,* —— U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 867 (1992); *cf. Morales v. Yeutter,* 952 F.2d 954, 957 (7th Cir.1991).

Defendants contend that the D.C. Circuit's reasoning in *Ayuda, Inc. v. Thornburgh,* 948 F.2d 742 (D.C.Cir.1991), holding that § 1255a(f) deprived the court of jurisdiction to hear certain claims under IRCA, requires a different result. *Ayuda* reads *McNary* as drawing a distinction between true collateral challenges which are not covered by IRCA's exclusive review provisions, and claims that dress themselves up as "procedural" challenges but actually seek to resolve the ultimate merits of an alien's application for adjustment of status which are covered. *Ayuda,* 948 F.2d at 749. We agree with the D.C. Circuit that the Supreme Court engaged in such line drawing so as to distinguish *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). *See McNary,* 111 S.Ct. at 897–98. *But see Catholic Social Services,* 956 F.2d at 921.

We disagree with *Ayuda,* however, insofar as it holds that a claim that unlawful INS procedures have deterred plaintiffs from filing applications is a claim which seeks to resolve the ultimate merits of an alien's application for adjustment of status. *See Ayuda,* 948 F.2d at 756–58. If plaintiffs succeed in obtaining an order from us to reopen the filing period as to them, they will still have to file timely applications and there is no guarantee that they will do so. Nor is there a guarantee that, if they do so, the applications will be granted. *Ayuda*'s assumption that plaintiffs "satisfy those other criteria so that they could present an otherwise 'prima facie application for adjustment of status,'" *Ayuda,* 948 F.2d at 757 (quoting 8 U.S.C. § 1255a(e)(2) (1988)), may have been valid in that case, but in this one the most that can be said is that plaintiffs who will file will have reason to believe that their applications will not be denied on the grounds that they are "likely at any time to become a public charge." 8

U.S.C. § 1182(a)(4) (Supp. II 1990). They may be wrong in this belief or their applications may be denied on other grounds in which case § 1255a(f) review procedures will be their exclusive avenue of relief. Thus, even if we grant relief in this case, plaintiffs' success on the merits of their applications does not follow as a matter of course. We conclude, as did the Court in *McNary*, that the case before us presents a true "collateral challenge" and that

> [u]nlike the situation in *Heckler*, the individual respondents in this action do not seek a substantive declaration that they are entitled to [adjustment of] status. Nor would the fact that they prevail on the merits of their purportedly procedural objections have the effect of establishing their entitlement to [adjustment of] status. Rather, if allowed to prevail in this action, respondents would only be entitled to have ... their applications reconsidered in light of the newly prescribed INS procedures.

*McNary*, 111 S.Ct. at 898.

B. *Does § 1255a(f)(2) deprive us of jurisdiction?*

■ *Ayuda*'s denial of jurisdiction rested independently on § 1255a(f)(2), which has no identical twin in the statute considered in *McNary*. This provision provides that: "[n]o denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States or of any State or reviewed in any administrative proceeding of the United States Government." The D.C. Circuit found that § 1255a(f)(2) "could not in our opinion indicate more plainly that the district court has no power to order the INS to grant [a change of status] to aliens who failed to file applications on time." *Ayuda*, 948 F.2d at 758.

Section 1255a(f)(2) speaks of "*a* late filing of *an* application" (emphasis added). Following the Court's reasoning in *McNary*, we interpret this phrase as relating only to denials of individual applications and not to collateral challenges to a practice or procedure. *See McNary*, 111 S.Ct. at 896 ("[t]he critical words ... de-

scribe the provision as referring only to review 'of *a determination* respecting *an application*' for SAW status. Significantly, the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure") (quoting 8 U.S.C. § 1160(e)(1)) (emphasis in *McNary*); *accord Catholic Social Services*, 956 F.2d at 920; *Doe v. Nelson*, 703 F.Supp. 713, 718 (N.D.Ill.1988). Section 1255a(f)(2) thus does not cover the collateral challenge before us.

We further find § 1255a(f)(2) inapplicable because the INS has, as yet, denied no plaintiff's application on late filing grounds. Thus the triggering event, the "denial of adjustment of status ... based on a late filing," has not occurred.

With respect to this point, the *Ayuda* court expressed concern that "aliens who missed the deadline could circumvent Congress' clear purpose of preventing them from coming to court after losing before the INS on this issue simply by going to court before filing with the agency." *Ayuda*, 948 F.2d at 758. This concern is not present here. Plaintiffs claim that they would have filed on time but for the INS practices under challenge and, as we shall explain below, individual plaintiffs will be required to demonstrate this in order to gain full relief. This action thus presents the question of whether *defendants* have circumvented a clear congressional purpose to provide a 12–month application period to qualified applicants, not whether plaintiffs have done so. *Cf. Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir.1991).

Neither IRCA's plain language nor its legislative history suggests that Congress intended, in § 1255a(f)(2), to insulate from judicial review INS regulations which assertedly have the effect of shortening or eliminating altogether the statutory application period. The amnesty provisions as a whole, in fact, indicate that Congress placed great importance on the proper implementation of the application period: Congress specified that there should be a "12–month" period, 8 U.S.C. § 1255a(a)(1)(A) (1988); it made non-discretionary the Attorney General's duty to ad-

just the status of those who meet eligibility requirements, including the requirement of a timely application, 8 U.S.C. § 1255a(a) (1988); and IRCA's legislative history explained that aliens "have contributed to the United States in myriad ways, including providing their talents, labor and tax dollars," and that the national interest lay in providing a "generous" amnesty program which included 12 months in which to apply. H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 49, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5,649, 5,653. These expressions of congressional purpose are consistent with judicial review of INS implementation of the application period. Given our presumption in favor of judicial review of agency action, we decline to read into § 1255a(f)(2) a congressional purpose to preclude review of the claim before us. "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review [of agency action]." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

In sum, we hold that 8 U.S.C. §§ 1255a(f)(1)–(4) do not bar federal courts from reviewing the present action.

## II. Validity of the INS Public Charge Regulations.

Turning to the merits, we consider plaintiffs' claim that the May 1, 1987 public charge regulations violated IRCA, the Administrative Procedure Act ("APA"), and the Fifth Amendment's guarantee of equal protection. Since we conclude herein that the regulations contravened IRCA throughout the one-year application period, we need not reach plaintiffs' APA and Fifth Amendment arguments, nor need we consider their challenge to the INS' dissemination policies.

### A. *Do the public charge regulations violate IRCA?*

■ Under IRCA's Special Rule for Determination of Public Charge (the "statutory special rule"), an alien "is not ineligible for adjustment of status" on public

charge grounds where she "demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 8 U.S.C. § 1255a(d)(2)(B)(iii) (Supp. II 1990). This provision requires an alien to show that she is *self*-supporting. The May 1, 1987 public charge regulations, on the other hand, excluded self-supporting aliens if they could not simultaneously support their families. In so doing, they violated the statute.

The May 1, 1987 regulations deemed "likely to become a public charge" any alien who fails to "demonstrate[ ] a history of employment in the United States evidencing self-support *without receipt of public cash assistance.*" 52 Fed.Reg. 16,-211 (1987) (codified as amended at 8 C.F.R. § 245a.2(d)(4) (1992)) (emphasis added). Public cash assistance, however, meant "income or needs-based monetary assistance ... received by the alien *or his or her immediate family members.*" 52 Fed. Reg. 16,209 (1987) (codified as amended at 8 C.F.R. § 245a.1(i) (1992)) (emphasis added). As the district court recognized, these provisions would exclude a self-supporting alien whose *family member received public assistance. Perales*, 762 F.Supp. 1059–60. The district court nonetheless found the regulations valid on the grounds that self-supporting aliens with a family member on public assistance might yet be admitted under the agency's Special Rule for Determination of Public Charge (the "regulatory special rule"), 8 C.F.R. § 245a.2(k)(4). *Perales*, 762 F.Supp. at 1060. We disagree with this analysis for two reasons.

First, under the regulatory special rule an applicant who qualifies under the terms of the rule must then apply for a discretionary waiver from the Attorney General. *See* 52 Fed.Reg. 16,212 (1987) (codified as amended at 8 C.F.R. § 245a.2(k)(4) (1992)) ("An alien who has a consistent employment history which shows the ability to support himself and his or her family ... *may be admissible under paragraph (k)(2) of this section* [providing for waivers of grounds of exclusion]") (emphasis added). The only apparent textual basis for

this two-stage process is that the statutory special rule exists within a larger subsection entitled "Waiver of numerical limitations and certain grounds for exclusion." 8 U.S.C. § 1255a(d) (Supp. II 1990).

The body of the provision makes clear, however, that Congress intended to directly exempt from public charge excludability aliens who qualify under the statutory special rule, and did not contemplate an additional waiver requirement. To begin with, the statutory special rule's application to any "adjustment of status *under this section*" expressly extends its reach beyond the waiver subsection. *See* 8 U.S.C. § 1255a(d)(2)(B)(iii) (Supp. II 1990). More importantly, the statutory special rule instructs that a qualified applicant *"is* not ineligible" on public charge grounds. *Id.* No waiver is necessary. Rather, once the Attorney General finds a "history of employment evidencing self-support" the statute precludes him from finding the applicant inadmissible on public charge grounds. Finally, had Congress merely intended the special rule to authorize waivers the provision would have been redundant. Other provisions already empowered the Attorney General to waive the public charge criterion for adjustment to temporary resident status. *See* 8 U.S.C. § 1255a(d)(2)(B)(i), (ii)(IV) (1988 & Supp. II 1990).

■ While we ordinarily accord deference to an agency's construction of the statute it administers, we need not do so where, as here, the text clearly establishes a contrary congressional intent.

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 2781–82 & n. 9, 81 L.Ed.2d 694 (1984) (citations omitted). Later changes in the INS position, culminat-

ing in the November 17, 1987 amendment excising the waiver requirement, *see* 52 Fed.Reg. 43,843 (Nov. 17, 1987) (codified at 8 C.F.R. § 245.2(k)(4) (1992)), strengthen this conclusion. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). We accordingly find that the regulatory special rule's waiver requirement violated IRCA, and that the district court erred in concluding that the regulatory special rule saved the regulations. *Cf. INS v. Cardoza–Fonseca,* 480 U.S. 421, 443, 107 S.Ct. 1207, 1219, 94 L.Ed.2d 434 (1987) (alien's right to remain in United States not equivalent to opportunity to gain asylum at Attorney General's discretion).

The regulatory special rule's deficiencies extended beyond the waiver issue and beyond November 17, 1987. As plaintiffs point out, the regulatory special rule *itself* looks impermissibly to an applicant's ability to support her family. Under the regulatory special rule, the public charge ground of exclusion would be lifted only for an applicant who could "show[ ] the ability to support himself *and his or her family* ... [and] the capacity to exist on his or her income and *maintain his or her family* without recourse to public cash assistance." 52 Fed.Reg. 16,212 (1987) (codified as amended at 8 C.F.R. § 245a.2(k)(4) (emphasis added)). By demanding more from the applicant than a demonstration of *self-* support, the only required showing under the statute, the provision further violated IRCA.

The record reveals that the INS recognized this problem, albeit belatedly, and moved to correct it. The agency's July 1989 amendments removed all references to an alien's family from the regulatory special rule. 54 Fed.Reg. 29,442, 29,443–44 (July 12, 1989). Thereafter, the Federal Register notice instructed, "an applicant need[ed] only [to] demonstrate a consistent employment history that shows the ability to support *himself or herself.*" *Id.* (emphasis added). These amendments postdated the May 4, 1988 cut-off date for

applications. Thus we have no difficulty finding that the regulatory special rule contravened the statute throughout the 12–month application period.

▊ Having so held, we note that our decision does not preclude the INS from *ever* attributing a family members' receipt of public assistance to the alien applicant. Where the child's public assistance is the family's only means of income the INS may reasonably conclude that the parent lives off of it. Indeed, IRCA's requirement that an alien show "self-support *without receipt of public cash assistance*" contemplates such a determination since, as plaintiffs concede, illegal aliens are not themselves eligible for public assistance. Having concluded that defendants may not exclude a self-supporting applicant based on her family member's receipt of cash assistance, we further hold that the INS may, in examining whether an applicant *is* self-supporting, consider whether she lives off her family member's cash assistance.

### B. *Did the Agency Promulgate its Unlawful Regulations?*

▊ Defendants argue that the post-May 4, 1987 policy memoranda discussed above more accurately reflected their policies as implemented than did the May 1, 1987 regulations. These policy memoranda, they contend, "did not represent any departure from the INS's public charge policies as the INS understood them at the inception of the amnesty filing period. Rather, the memoranda clarified the INS's policy by responding to questions from, and providing guidance to, the INS's four regional offices." Appellees' Brief at 48–49. We understand defendants to argue that, notwithstanding the confusing language of the May 1, 1987 regulations, their policies as they understood and implemented them were consistent with IRCA throughout the filing period and could not have unlawfully deterred plaintiffs' applications.

This argument is convincingly rebutted by documentation revealing that the INS disseminated the very aspects of the May 1, 1987 regulations which we have found unlawful. For example, plaintiffs' exhibit 54, entitled "The Public Charge Issue" and written by Richard Berryman, Chief Legalization Officer and Legalization Training Officer for New York, records the instructions conveyed at three regional staff trainings in April and May of 1987 and at a session for QDE's in Manhattan on July 24, 1987. In reference to the regulatory special rule, Officer Berryman stated that:

> In summary, 245A applicants for temporary residence who have received cash assistance because they were unable to support themselves *and/or their families* are subject to 212(a)(15) [the public charge exclusion]. They may *apply for a waiver* if the waiver criteria apply: family unity, humanitarian considerations and in the public interest. Most of the QDE representatives present indicated that most of their clients who had received welfare did so due to entitlements to their U.S. citizen children. I indicated that these applicants *should file a waiver.* (emphasis added).

This paragraph contains both of the policies for which we have found statutory authorization lacking: it looks to whether applicants are able to support their families; and, for those who satisfy the special rule, it conditions eligibility on satisfaction of the discretionary waiver process.

Other instances in which the INS disseminated its unlawful policies include an October 1, 1987 newsletter to QDEs which discusses the waiver requirement, and an update from the Eastern Regional Officer mailed on September 30, 1987 to local Legalization Offices reaffirming that a special rule applicant would "NEED CONSISTENT HISTORY OF EMPLOYMENT *TO MAINTAIN FAMILY*" (emphasis added).

Defendants cite only an October 15, 1987 issue of the National Center for Immigrant's Rights' *Legalization Update*, which states that·

> [a]n INS agent at the RPF in Texas has apparently stated that welfare received by a U.S. citizen child of legalization eligible parents will not be considered in determining public charge excludability of the parents.... Reports from other

states, including New Mexico and New York, seem to indicate that INS may have adopted a similar policy.

This single perception of what policy the INS "may have adopted," when viewed against the substantial publicity going the other way, is insufficient to support defendants' claim that "the advocate community was aware that the INS was not imputing AFDC aid received by children to alien parents." The record as a whole convinces us that the unlawful May 1, 1987 regulations constituted official agency policy as communicated to aliens in New York State.

III.  Relief.

■  Having found injury, we turn to the question of relief.  Generally, federal courts can remedy unlawful agency action both through prohibitory injunctions, *see Youngstown Sheet & Tube Co. v. Sawyer*, 103 F.Supp. 569, 576 (D.D.C.) *aff'd* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), and mandatory injunctions, *see Carpet, Linoleum and Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir.1981); *Covelo Indian Community v. Watt*, 551 F.Supp. 366, 381 (D.D.C.1982); *cf. Morales v. Yeutter*, 952 F.2d 954, 957 (7th Cir.1991).  Although plaintiffs also suggest equitable estoppel and equitable tolling, we need not consider these doctrines here.  *See Lyng v. Payne*, 476 U.S. 926, 936, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (1986).  We do, however, address defendants' contention that *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), bars federal courts from extending IRCA's application deadline.

*Pangilinan* concerned the Nationality Act of 1940 ("Act") making citizenship available to those aliens who served honorably in the United States Armed Forces during World War II.  The program operated in the Philippines from August 1945 to a December 31, 1946 cutoff date.  However, in response to the Philippine government's complaints of a manpower drain, the INS withdrew its naturalization officer from that country for nine months of that period.  In 1948, Congress amended the Act to liberalize the citizenship program but specifically excluded Filipino servicemen from any further naturalization.

Nearly forty years after the expiration of the Act, sixteen Filipino nationals brought suit claiming that the nine-month hiatus violated the Act and that they were entitled to apply for and receive citizenship.  Fourteen had taken no affirmative steps to be naturalized before the December 31, 1946 cutoff date.  One had taken preliminary steps to obtain citizenship in the U.S. but did not complete his petition.  The last had inquired at the American embassy before the cutoff date, but was told that there was no one there to assist him.  The Ninth Circuit held for plaintiffs and, pursuant to its equitable powers, ordered their naturalization.

The Supreme Court reversed, holding that "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [congressional] limitations."  *Pangilinan*, 486 U.S. at 885, 108 S.Ct. at 2217.  The Court found that the December 31, 1946 cut-off date, coupled with the 1948 amendment specifically excluding Filipino servicemen from further naturalization, established a "congressional command."  It held the Ninth Circuit's equitable powers insufficient to warrant the conferral of naturalization in the face of "a 'public policy established by Congress.'"  *Id.* at 883, 108 S.Ct. at 2216 (quoting *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973)).

■  We find the circumstances of *Pangilinan* distinguishable from the present case.  In *Pangilinan*, the plaintiffs faced two hurdles neither of which is present here.  The relief they sought—naturalization—was beyond the court's authority since

the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers.  *See, e.g.*, 28 U.S.C. § 1361; 28 U.S.C. § 1651.  Rather, it has been given them as a specific function to be performed in strict compli-

ance with the terms of an authorizing statute.

*Pangilinan,* 486 U.S. at 883–84, 108 S.Ct. at 2215–16. In this case, the plaintiffs seek only that we use our power to compel the INS to open its doors to their applications, with the chips thereafter to fall where they may.

Secondly, and ultimately determinative here, the mix of congressional purposes at issue are different from those in *Pangilinan* and thus, despite the surface similarities of the two cases, compel a different outcome. Defendants argue that IRCA's requirement that aliens apply "during the 12–month period beginning on a date ... designated by the Attorney General," 8 U.S.C. § 1255a(a)(1)(A), establishes a May 4, 1988 "cutoff date" analogous to the Nationality Act's December 31, 1946 deadline and that Congress reaffirmed this cutoff by failing to pass a 1988 amendment to extend the filing deadline. Thus they contend that, as in *Pangilinan,* congressional policies bar us from extending the filing deadline. The district court agreed, holding that "[i]n refusing to accept applications beyond that deadline, INS is enforcing the public policy established by Congress.... Under the analysis of *Pangilinan,* we may not compel INS to accept applications for amnesty after May 8 [sic], 1988." *Perales,* 762 F.Supp. at 1067.

More recently, the Ninth Circuit, considering a similar request to extend the IRCA deadline, found that "[i]n IRCA, Congress did not provide a specific cutoff date for amnesty applications. The Act establishes a twelve-month period for aliens to apply for amnesty. 8 U.S.C. § 1255a(a)(1)(A). It does not contain a specific deadline." *Catholic Social Services,* 956 F.2d at 922 (emphasis added). The court accordingly distinguished *Pangilinan* on the grounds that extending the deadline for those denied the full twelve months "effectuates, rather than frustrates, the public policy established by Congress." *Id.*

Briefly stated, we find the "cutoff date" versus "period" distinction an artificial one. While the Nationality Act of 1940 had a "cut-off date" of December 31, 1946, we might just as easily conclude that it described an application "period" of March, 1942 though December 31, 1946. *Pangilinan,* 486 U.S. at 877–79, 882, 108 S.Ct. at 2212–14, 2215. Similarly IRCA, as applied, fixed both a cutoff date of May 4, 1988, and a twelve-month application period. The question posed by *Pangilinan* is not whether IRCA establishes a cutoff date or an application period, but how to give recognition to the presence of both in light of congressional intent. More precisely, in this case we must determine whether, in the circumstances, extending the deadline to provide an effective twelve-month application period to aliens who would have applied in time but for unlawful INS actions would effectuate or undermine congressional intent.

In *Pangilinan,* the Court gave effect to congressional policies by enforcing the cutoff date. Congress, acting in response to the Philippine government's manpower drain complaint, had foreclosed *all* Filipino naturalizations after December 31, 1946. The amount of a given Filipino's access to the Act's original application period became irrelevant in light of the overriding congressional objectives which were served by strict observance of the Act's cutoff date. In failing to honor the cutoff, the Ninth Circuit's *Pangilinan* decision contravened expressed congressional will.

When carefully analyzed, however, the congressional purpose underlying IRCA leads us to a different conclusion than that reached in *Pangilinan.* At the outset, we note that IRCA's amnesty program sprang from a competing set of congressional priorities. On the one hand, Congress desired to exclude the large number of undocumented aliens who, having entered the country in direct violation of our laws, were adversely impacting U.S. labor and the economy. H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 52, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5,649, 5,656. On the other hand, Congress acknowledged that "past failures to enforces [sic] the immigration laws have allowed [the aliens] to enter and to settle here," *id.* at 49, *reprinted in* 1986 U.S.Code Cong. &

Admin. News 5,649, 5,653, and that many long-term undocumented aliens had "contributed to the United States in myriad ways, including providing their talents, labor and tax dollars," *id.* Congress further recognized that enforcement as to all illegal aliens was a practical impossibility. As the House Report explained: "the alternative of intensifying interior enforcement or attempting mass deportations would be both costly, ineffective, and inconsistent with our immigrant heritage." *Id.*

IRCA balanced these competing concerns. Employer sanctions removed economic incentives for further illegal immigration. At the same time, the amnesty program gave aliens of long-standing residence a twelve-month opportunity to apply for citizenship while conditioning applications on rigorous eligibility criteria including the "unlikely to become a public charge" standard at issue here.

The length of the application period figured importantly in this balance. Given that aliens "live in fear" and are afraid to come forward, H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 49, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5,649, 5,653, integration of productive aliens required an ample application period during which they could come to understand the program. Consistent with this policy, Congress provided for the broad dissemination of information, 8 U.S.C. § 1255a(i) (1988), included a confidentiality provision, 8 U.S.C. § 1255a(c)(5) (1988), provided for QDE's to mediate between the aliens and the agency, and funded outreach services. Senator Simpson, a chief sponsor of the legislation, contending that aliens would come to understand the program, stressed the length of the application period: "each and every eligible alien will be aware of the requirements. There is enough time to do that—15 months—3 months after the date of enactment and then another year [i.e. the 12–month application period]." 129

Cong.Rec. 12,814 (1983). As Senator Cranston pointed out: "The whole purpose of having a legalization program—to bring some of the presently undocumented workers into the mainstream—is undercut if overly stringent procedures prevent vast numbers of aliens from qualifying and intimidate many others from even applying." *Id.* at 12,810.

The congressional goal of finality also necessitated a generous twelve-month period. As the House Report stated: "The Committee intends that the legalization program should be implemented in a liberal and generous fashion.... Such implementation is necessary to ensure true resolution of the problem and to ensure that the program will be a one-time-only program." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 72, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5,649, 5,676. Senator Simpson similarly emphasized that "the legalization program is intended to be a one-time only, one-time shot, *and to be carried out carefully over a 15–month period.*" 129 Cong.Rec. 12,811 (1983) (emphasis added).

By dissuading aliens who would otherwise have applied, the unlawful public charge regulations thus conflicted with congressional desires to integrate productive aliens and to achieve finality, both of which goals were dependent on the full 12–month application period. Congressional intent accordingly requires us to extend the filing deadline for such persons, so as to make effective the full twelve months. The present case is, in this respect, distinguishable from *Pangilinan* in which congressional policies required strict observance of the statutory cutoff date, but were indifferent to diminishment of the application period.[4]

Defendants assert that the 1988 failure of an amendment to extend the application period should change our analysis. Proponents of the amendment ventilated con-

---

**4.** Congress' decision to leave the specific dates of IRCA's application period up to the Attorney General further evidences the relative insignificance of these dates. 8 U.S.C. § 1255a(a)(1)(A). The focus of legislative debate was instead on the *length* of the application period. While the House bill initially suggested an 18–month filing period, negotiations with the Senate led to the establishment of a "12–month period beginning on a date ... designated by the Attorney General." *Id.*

cerns that aliens had not come forward due to fear, *see* 134 Cong.Rec. 9,291, 9,295–96 (1988) (remarks of Senators Kennedy and Gore), and due to confusion over the program requirements, *id.* Defendants argue that the rejection of these arguments signals a congressional intent to preclude the relief plaintiffs seek.

We find the 1988 debates consistent with our understanding of earlier congressional policy. From the outset, Congress recognized that fear and confusion would impede the amnesty process. To address these concerns, it included a confidentiality provision, 8 U.S.C. § 1255a(c)(5) (1988), a generous twelve-month period, 8 U.S.C. § 1255a(a)(1)(A) (1988), and other safeguards. Yet it intended for the twelve-month period to be final, even for those who for its duration remained too confused or afraid to come forward. Congress expressed its desire for finality by making timeliness an eligibility *requirement*, 8 U.S.C. § 1255a(a)(1)(A) (1988), and by precluding judicial or administrative review of individual denials for late filing, 8 U.S.C. § 1255a(f)(2) (1988). Legislators further made clear their belief that "legalization is an extraordinary benefit, an extraordinary grace" to which aliens have no entitlement if they fail to do their part in completing the application process. 129 Cong.Rec. 12,-814 (1983) (remarks of Senator Simpson). Thus, whether we look to the 1988 debates, or the plain terms of the 1986 Act, we are convinced that aliens' fear or confusion could not now be grounds for extending the filing period.

At no point, however, did Congress intend to foreclose a remedy where unlawful *INS conduct* was the cause of aliens losing the benefit of the full twelve-month period. As early as 1983, Senator Simpson made clear that "[i]mplicit in these requirements and in this framework is the Committee's intent that the program be carried out firmly and fairly.... the legalization program is ... to be carried out carefully over a 15–month period." 129 Cong.Rec. 12,811 (1983). Far from altering this conception, the 1988 debates reaffirmed Congress' expectation that there would be equitable remedies for those actually harmed by unlawful INS activity. Senator Grassley, an opponent of the amendment, remarked that:

> the proponents argue that certain court decisions recently handed down now make some 75,000 persons eligible for the legislation program. There may very well be equitable reasons to allow these individuals to apply; but there is no doubt that the courts are well equipped to evaluate equitable considerations. The Senate need not enact a broad extension to accommodate certain litigants.

134 Cong.Rec. 9,295 (1988). No opponent suggested otherwise. They limited their remarks to cases in which the INS had acted lawfully. *See, e.g.,* 134 Cong.Rec. 9,293 (1983) (remarks of Senator Simpson) ("The INS went far beyond congressional requirements in publicizing this program. They went far beyond the requirements in publishing the regulations.... There is not a question out in the land people have not known exactly what we were doing here."). On this record, we conclude that neither in 1986, nor in 1988, did Congress intend to foreclose the availability of traditional equitable remedies for aliens who would have applied for amnesty but for unlawful INS regulations. To the extent that the unlawful public charge regulations eviscerated the application period for certain aliens, we effectuate congressional intent by extending the filing deadline to provide them with a fully effective twelve months.

### IV. The claims of the governmental plaintiffs.

The district court apparently rejected the claims of plaintiffs New York City and New York State. These plaintiffs properly noticed their appeal, but have neither briefed nor argued the merits of their claims before us. We therefore remand these claims to the district court for reconsideration in light of this opinion.

### V. Order of Relief.

We vacate the district court's judgment. On remand, we instruct the district court to provide permanent injunctive relief that will:

(1) Require defendants to disseminate, consistent with the terms of 8 U.S.C.

§ 1255a(i), information regarding the effect of this decision on illegal aliens who were living in New York State between May 5, 1987 and May 4, 1988.

(2) Enjoin defendants, for a one-year period following the issuance of the injunction, from refusing to accept applications from members of plaintiffs' class for adjustment to temporary resident status, and require them to treat such applications as having been timely filed. In connection with the application, however, each applicant should be required to submit adequate proof that at some point prior to May 4, 1988 the applicant was aware of the policies contained in the INS' unlawful public charge regulations and that but for this awareness the applicant would have filed a timely application for adjustment of status. The failure to provide such proof may constitute an independent basis for denial of the application. After hearing the parties, the district court may determine the specific nature of the proof required. Individual INS determinations upon each application, including determinations as to the sufficiency of proof of deterrence, would then be subject to the review procedures specified at 8 U.S.C. § 1255a(f)(1)(3) and (4).

Finally, we note plaintiffs' request that defendants be required to reopen and readjudicate all New York State temporary resident status applications denied on public charge grounds. We agree that these applications should be readjudicated in accordance with the public charge regulations as amended in November of 1987 and July of 1989. However, we understand that this has already occurred pursuant to the July 21, 1989 Stipulation and Order. To the extent that any such applications have not been readjudicated pursuant to the Stipulation and Order, the injunction should include relief to this effect.

## CONCLUSION

We reverse the decision of the district court, and remand for further proceedings in accordance with this opinion.