Heriberto MORALES, et al.,
Plaintiffs–Appellees,

v.

Clayton K. YEUTTER, Secretary of
Agriculture, et al., Defendants–
Appellants.

No. 90–2787.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1991.

Decided Dec. 18, 1991.

Thomas F. Gardner, Jeffrey J. Baker (argued), James A. White, Jones, Day, Reavis & Pogue, Vincent H. Beckman, Jean Agathen, Manuel Sanchez, Kate Collins, Sanchez & Daniels, Chicago, Ill., for plaintiffs-appellees.

James G. Hoofnagle, Jr., Asst. U.S. Atty., Craig A. Oswald, Office of the U.S. Atty., Criminal Div., Chicago, Ill., Richard M. Evans, Mark C. Walters, Alice M. King (argued), Dept. of Justice, Office of Immigration Litigation, Washington, D.C., for defendants-appellants.

Before POSNER, FLAUM, and MANION, Circuit Judges.

POSNER, Circuit Judge.

Five years ago Congress overhauled the nation's immigration laws. Included in the overhaul was a grant of amnesty to illegal aliens who perform "seasonal agricultural services," defined as "the performance of field work related to planting, cultural practices, cultivating, growing and harvesting of fruits and vegetables of every kind and other perishable commodities, as defined in regulations by the Secretary of Agriculture." Immigration Reform and Control Act of 1986, § 210(h), 8 U.S.C. § 1160(h); and see 2 Charles Gordon & Stanley Mailman, *Immigration Law and Procedure* § 53.02 (rev. ed. 1991). In June of 1987, following notice and public comment, the Secretary issued a regulation which provided that the "other perishable commodities" produced by means of "seasonal agricultural services" were those that "have critical and unpredictable labor demands," a term defined in the regulation to require that "the period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." The regulation went on to list the commodities that meet this criterion (Christmas trees, cut flowers, herbs and spices, hops, sugar beets, tobacco, and a few others), and stated that anything not listed—and sod was singled out as not listed—is excluded. 52 F.R. 20372 (June 1, 1987). (Sod, or turfgrass, is grass that is grown on farms, cut into strips with the undersoil attached—like scalps—and transplanted to create lawns.) Illegal aliens working on sod farms were therefore not eligible for the "SAW" amnesty, as the section 1160 program is called (short for "seasonal agricultural worker").

Sod farmers, as well as illegal aliens working for them, brought suit in federal district court to invalidate the regulation as arbitrary insofar as it excluded sod from the perishable commodities encompassed by the SAW program. The district judge enjoined the exclusion and ordered the Department of Agriculture to reconsider its regulation. 702 F.Supp. 161 (N.D.Ill.1988). The statutory deadline for aliens to apply for amnesty was only a month away, so the judge also ordered the Immigration and Naturalization Service (which had been joined as a party) to accept applications from sod workers for SAW status, and this was done. There was no appeal. Instead the Department of Agriculture conducted a further hearing, but again it concluded that sod should be excluded. 53 F.R. 50375 (Dec. 15, 1988). The plaintiffs renewed their suit in the district court, which on June 11, 1990, ordered the Department to revise the regulation to include sod. 772 F.Supp. 1033 (N.D.Ill.1990). The Department (joined by the other federal defendants) then filed this appeal, but it did not seek a stay of the district court's order; and on November 3, 1990, it issued a new regulation in compliance with the order. This regulation made the sod workers eligible for amnesty—and on December 1, 1990,

they all became permanent residents of the United States.

■ Is the suit therefore moot? All sod workers potentially eligible for amnesty under the SAW program have become permanent residents, having slipped through the window opened by the November 3 regulation. However, when an alien's status is adjusted from that of temporary to that of permanent resident, which is what happened to the sod workers, the government has five years within which to rescind the adjustment if "it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status." 8 U.S.C. § 1256(a). If we should hold the November 3 regulation invalid and reinstate the previous regulation excluding sod workers from the SAW program, the Attorney General might be entitled to rescind their permanent-resident status. That he could is the natural reading of section 1256(a). It would be consistent with the established policy against estopping the government—and the sod workers were on notice that the government had appealed the district court's order invalidating the original regulation. It has some support in cases that allow an adjustment of status to be rescinded on the basis not only of fraud (the usual ground) but also of mistake, as in *In re Tayabji*, 19 I. & N. Dec. 264 (BIA 1985), or—the closest to our case—because the alien's marriage, which served as the basis for the adjustment, was later annulled although not on the ground of fraud against the immigration laws. *In re Samedi*, 14 I. & N. Dec. 625 (BIA 1974). It is also the reading of the Justice Department, which reserves the right to proceed against these workers in accordance with it. The possibility of such a proceeding, given the undemanding standard of Article III of which we spoke in *North Shore Gas Co. v. Environmental Protection Agency*, 930 F.2d 1239, 1242 (7th Cir.1991), and *Harris v. Board of Governors*, 938 F.2d 720, 723 (7th Cir.1991), is enough to make the present case a live controversy, notwithstanding the Agriculture Department's failure to seek a stay of the district judge's decision invalidating its regulation. (No doubt such a stay would have been denied, since the effect of granting it would have been to make the statutory deadline run out and thus disqualify the plaintiffs from participating in the SAW program even if the original regulation really was invalid.) This case is unlike *Harris*, where a similar failure really did moot the case because there was no counterpart to section 1256(a). 938 F.2d at 722.

We are not obliged to attempt a definitive interpretation of section 1256(a) in an effort to dispel uncertainty about what might happen to the sod workers if the original regulation is reinstated. Questions of ripeness to one side, *Ubiera v. Bell*, 463 F.Supp. 181, 185 (S.D.N.Y.1978), we do not have the power of definitive interpretation. Even if we held section 1256(a) inapplicable to the sod workers because their status had been adjusted in accordance with a regulation in force at the time, the Supreme Court might disagree. Yet if on the strength of our interpretation we dismissed the present case as moot and the Supreme Court refused to review our action, the government would be stymied, because there would be no mechanism for reinstating the original regulation.

■ A second jurisdictional question is whether the regulation can be challenged by a suit to enjoin it. At argument, the government withdrew its contention that it cannot be, but as the question is jurisdictional and therefore nonwaivable we shall consider it anyway. The SAW provision of the Immigration Reform and Control Act states: "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this section." 8 U.S.C. § 1160(e)(1). The section goes on to provide that judicial review of such determinations shall be by means of court of appeals review of deportation orders, and, in the case of exclusion orders, district court review in habeas corpus proceedings. There is no provision for injunctive suits. Yet it is apparent from the language of the provision and from the character of immigration proceedings, and was so held by the Supreme Court in a case that also involved the SAW program, *McNary v. Haitian*

*Refugee Center,* —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), that the provision is limited to cases brought by a worker whose application for adjustment of status under the SAW program is turned down. *His* only judicial remedy is to appeal from the order deporting him or, if he is being held in custody, the order excluding him. Either remedy presupposes a valid regulation defining entitlement to SAW status, so that the issue is merely whether the alien qualifies for an adjustment of status under the regulation. It is unlikely that Congress thought a deportation or habeas corpus proceeding an apt vehicle for determining the validity of a general regulation affecting an entire agricultural industry. The familiar and by now traditional method for obtaining such a determination is to bring an injunctive suit in federal district court under 28 U.S.C. § 1331, the grant of federal-question jurisdiction. We have no reason to suppose that Congress wanted to displace that method merely because it decided to channel judicial review of denials of individual applications for adjustment of status under the SAW program through the usual routes by which aliens obtain judicial review.

We are mindful of the concern expressed by the D.C. Circuit in *Ayuda, Inc. v. Thornburgh,* 948 F.2d 742, 753 (D.C.Cir. 1991), with the danger of undermining the remedial scheme of the immigration laws by imputing patterns and policies behind determinations and then allowing those patterns and policies to be challenged in injunction suits under 28 U.S.C. § 1331. That danger is not present, however, when as in this case the challenge is to a formal regulation determining eligibility. And here as in *McNary* (a challenge to the procedures used by the immigration service in processing SAW applications), the procedure that the statute establishes for judicial review of denials of "determinations" is inadequate to permit a full judicial evaluation of the validity of "procedures and practices" as distinct from the validity of denials of individual applications. 111 S.Ct. at 896.

On to the merits. The parties agree that we must uphold the regulation unless it is arbitrary and capricious. There was much discussion in the briefs and at argument about the nuances of this standard and the precise degree of deference that it commands in the circumstances of this case. We are a little impatient with that discussion. There is a division within this court over whether we must or even can establish fine gradations of judicial review. (See the opinions in *United States v. McKinney,* 919 F.2d 405 (7th Cir.1991); also *Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914, 916–17 (7th Cir.1991).) One school of thought holds that the verbal differences in standards of judicial review (arbitrary and capricious, clearly erroneous, substantial evidence, abuse of discretion, substantial basis, etc.) mark real differences in the degree of deference that the reviewing court should give the findings and rulings of the tribunal being reviewed. The other school holds that the verbal differences are for the most part merely semantic, that there are really only two standards of review—plenary and deferential—and that differences in deference in a particular case depend on factors specific to the case, such as the nature of the issue, and the evidence, rather than on differences in the stated standard of review.

We need not try to resolve the dispute here. Under either approach, our review in *this* case must be highly deferential. On the one hand, the plaintiffs concede as they must that the arbitrary and capricious standard is at the upper end of the deference spectrum when the different verbal standards of review are arrayed in order of deference. On the other hand, the nature of the issue here, and the evidence that was before the Agriculture Department, require us to defer liberally to its decision to exclude sod from the SAW program even if the words "arbitrary and capricious" are not thought interestingly different from "clearly erroneous." Since Congress did not require the Department to use formal rulemaking in carrying out its regulatory function under the SAW provision, the Department was entitled to and did use informal (notice-and-comment) procedures. 5 U.S.C. §§ 553(b), (c); *Vermont*

*Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 523–24, 98 S.Ct. 1197, 1201–02, 55 L.Ed.2d 460 (1978); *United Air Lines, Inc. v. Civil Aeronautics Board,* 766 F.2d 1107, 1116 (7th Cir.1985). In two rounds of informal rulemaking (the second under order by the district court), the Department gave notice of the drift of its thinking and the public submitted written comments. The Department considered the comments and issued a statement explaining in considerable detail, and with refreshing lucidity for a bureaucratic document, why it was adhering to its position that sod should be excluded from the SAW program. It is not easy for a court to conduct a penetrating inquest on such a proceeding. Apart from the Department's statement (actually plural, because an initial statement accompanied its original rule), the record consists only of the public comments plus a few additional comments solicited and added to the record by the Department itself. The public comments are entirely one-sided, because the only people taking an interest in the regulation are sod farmers and the illegal aliens employed by them and of course both groups want sod included in the SAW program—the farmers so that they can have a larger and cheaper labor supply than if they are limited to hiring lawful U.S. residents, and the aliens so that they can avoid deportation. One might have expected labor unions to submit comments urging the exclusion of sod from the SAW program in order to create more jobs for Americans, but unions have had little success in organizing agricultural workers; in any event no union submitted comments. Most of the comments in the first round (before the remand by the district court) rang minor changes on two form letters obviously prepared by the sod growers' association and distributed to its members in a successful effort to pad the record. The remand evoked more careful comments, yet none of the comments in either round was subject to cross-examination or to any other method of verification or falsification. The Department was not required to take them at face value.

Also, the issue the Department was required to resolve is insolubly vague. In practical lay terms it is how desperately the sod farmers need a reserve army of seasonal workers whom they can deploy as needed to meet sudden, unexpected demands for farm labor. It is an issue of more or less. Every firm faces uncertainty with respect to the demand for its product or service and would therefore like to have access to a force of casual labor that could be hired as the need arose and fired, possibly within days of hiring, as it abated. The Department had to make a judgment, bereft of criteria furnished by Congress (but the plaintiffs do not argue that the statute is an unconstitutional delegation of legislative power to the executive branch), as to how much hardship a class of employers must demonstrate in order to be allowed to preserve the illegal seasonal workforce on which they have come to rely. It is exceedingly difficult for a court to second-guess such a judgment. We must take much on trust and one factor in our deciding how much to take on trust is the direction of the agency's bias. Agencies such as the Department of Agriculture that have basically a promotional role with regard to a single industry or sector of the economy tend to regard "their" industry as their constituency and to be solicitous of its interests. Agricultural interests want as large and cheap a labor supply as possible, so when the Department excluded sod it was acting against the grain of its natural bias, and such a judgment deserves particular respect.

The Department's statement gives considerable weight to the fact that the cutting of sod is a highly mechanized operation. The plaintiffs object that the regulation itself defines the critical question as the predictability of the farmer's labor needs and says nothing about mechanization. But the points are linked. The more the farmer substitutes capital for labor, the fewer workers he needs—and in particular the fewer *casual* workers he needs, because the operation of farm machinery requires skills that most seasonal workers lack. A sod farm that uses machinery to plow, irrigate, apply chemicals and pesti-

cides, and cut the sod when it is ready for sale does not need a reserve army of seasonal laborers to help with the harvest, especially since sod, unlike, say, oranges, does not have to be harvested in a narrow window of ripeness between green and rotten. Sod is grass; it can wait to be cut till a worker shows up to cut it. At least this is so as a matter of biology, but of course we should not stop there. The practice is that the consumer, landscape architect, or other buyer of sod waits to place his order with the sod farmer until the day before delivery. The sod is cut (usually by machine) that evening or early the next morning and is stacked and inspected by hand. So the harvest is unpredictable after all, and requires labor. In its statement the Department responded that the sod farmer must use his full-time work force for harvesting because a day's notice is too little to gather a crew of casual laborers. Is it? We are skeptical, but the only "evidence" against the Department's speculation is a handful of letters from farmers who say they can't afford a full-time crew; and this is not enough to upset a finding that, to repeat, need not be based on trial-type evidence, since this is informal rulemaking.

The plaintiffs aim much of their fire at what they contend is the Department's feeble effort to distinguish the commodities that it included in the SAW program from sod. They pour withering scorn on the inclusion of hothouse flowers, pointing out that a greenhouse is a controlled environment. That is true, but it is not the only difference between flowers and sod. The environment in a greenhouse is not totally controlled, since the amount of sun is a variable; and flowers in a greenhouse are not cut by machine. But even if the Department has not treated all perishable commodities consistently, this is not a powerful argument for including sod; maybe flowers, or hops, or sugar beets, or Christmas trees should be excluded. The SAW regulations include herbaceous annuals, herbs, hops, and horticultural specialties and exclude hay, honey, and horses, 2 Gordon & Mailman, *supra*, § 53.02[2][b], at pp. 53–8 to 53–10—and this is just the h's. Talk about comparing apples and oranges!

The plaintiffs question the Department's analytic capabilities. The Department quoted the comment of one sod farmer that "One day we might cut 100,000 or 200,000 square feet of sod and the next day or a few days later none at all," and observed that "assuming this farm harvests only half of its 900 acres per year, it would be necessary to harvest an average of 115,000 square feet per weekday. This suggests that the harvesting operation on this farm is a largely continuous operation." The plaintiffs argue that it is illogical to infer a steady labor demand from testimony of extreme variability. That misses the point. If the farmer is *averaging* 115,000 square feet per workday, yet 100,000 is a good day and 200,000 apparently a day of maximum activity, there can't be too many off days. If 200,000 square feet days are rare, zero days must be even rarer, since the average of zero and 200,000 is only 100,000, which is below the farm's average.

Elsewhere in its statement the Department remarked that "if the grower is unable to perform the pre-harvest irrigation, he has the opportunity to delay his harvest schedule"—to which the plaintiffs reply that without irrigation the sod will die. The Department's rejoinder is that sod is grass, and while grass will turn yellow in a drought, it rarely dies, and that anyway irrigation is not performed by seasonal workers carrying watering cans any more than pesticides are applied by spraying the individual insects—irrigation is performed by opening a valve and pesticides are applied by spreaders drawn by tractors. This is overstated. Robert D. Emmons, *Turfgrass Science and Management* 255 (1984); Stephen T. Cockerham, *Turfgrass Sod Production* 41, 43, 63 (University of California Division of Agricultural and Natural Resources, Publication 21451, 1988). Baby turf is less robust than mature sod and even if it survives a drought it may be left stressed and ugly and its value consequently diminished. Some sod farmers do not have permanent irrigation works but instead trundle their water pipes from place to place, and this requires hand labor. And pesticides and herbicides are not al-

ways applied to an entire field; instead the farmer may spray the individual infested plants and offending weeds by hand. But all this is to say once more that we are dealing with questions of more and less. It would undoubtedly be a great convenience to sod farmers, as to all farmers (as to all employers—but only farm employers have a SAW program), to have access to a large force of cheap workers. That cannot be decisive. The question is whether their need is critical. The Department of Agriculture had reason to think not.

The plaintiffs would be on solider ground if they had submitted statistics concerning fluctuations in the number of seasonal workers employed by sod farmers. Such statistics could have been obtained by the sod growers' association, the principal plaintiff in fact in this case. In the absence of evidence that the Department acted irrationally in excluding sod, we have no basis for concluding that its original regulation was invalid. The judgment must therefore be reversed with directions to enter judgment for the Department of Agriculture and dismiss the suit.

We commend counsel for both sides for their excellent briefs and argument.

REVERSED.