CAPITAL CITIES/ABC, INCORPORAT-
ED, Schurz Communications, Incorpo-
rated, Quincy Broadcasting Company, et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

CBS, Incorporated, Association of Inde-
pendent Television Stations Incorporat-
ed, National Broadcasting Company, In-
corporated, et al., Intervenors.

Nos. 93–3458, 93–4001, 93–4002, 93–
4015, 93–4075 and 94–1111.

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1994.

Decided July 12, 1994.

J. Roger Wollenberg, Joel Rosenbloom,
Louis R. Cohen (argued), Jonathan Jacob
Nadler, Wilmer, Cutler & Pickering, Wash-
ington, DC, Stephan Weiswassen, Capital
Cities/ABC, Inc., New York City, for Capital
Cities/ABC, Inc.

Richard D. Bonewitz, William N. Fara-
baugh, Farabaugh & Chapleau, South Bend,
IN, for Schurz Communications, Inc.

Steven E. Siebers, Scholz, Loos, Palmer,
Siebers & Duesterhaus, Quincy, IL, for Quin-
cy Broadcasting Co.

Andrew J. Schwartzman, Gigi B. Sohn,
Media Access Project, Washington, DC, for
Arizona Consumers Council and Foundation
for Independent Filmakers.

Ian D. Volner (argued), N. Frank Wiggins, Venable, Baetjer, Howard & Civiletti, Jonathan Berkhahn, King World Productions, New York City, for King World Productions, Inc.

Daniel M. Armstrong (argued), Sue Ann Kanter, Renee Licht, C. Grey Pash, and William Kennard, F.C.C., Washington, DC, for F.C.C.

Catherine G. O'Sullivan, Dept. of Justice, Civ. Div., Appellate Section, Nancy C. Garrison, Dept. of Justice, Antitrust Div., Appellate Section, Janet Reno, U.S. Atty. Gen., Washington, DC, Barbara Z. Brook, Asst. U.S. Atty., South Bend, IN, for U.S.

Richard E. Wiley, Lawrence W. Secrest, III, Ellen O. Kaden, Daniel E. Troy, Wiley, Rein & Fielding, Washington, DC, David L. Shapiro, Cambridge, MA, for CBS, Inc.

James J. Popham (argued), Ass'n of Independent Television Stations, Inc., Washington, DC, for Association of Independent Television Stations, Inc.

Richard Cotton, Ellen Shaw Agress, National Broadcasting Co., New York City, Michael McConnell, Mayer, Brown & Platt, Chicago, IL, Michael Kellogg and Jeffrey A. Lamken, Kellogg, Huber & Hansen, Howard Monderer, National Broadcasting Co., Washington, DC, for National Broadcasting Co., Inc.

John D. Lane, Robert M. Gurss, Wilkes, Artis, Hedrick & Lane, Washington, DC, for Program Producers and Distributors Committee.

William S. Reyner, Jr., Mace J. Rosenstein, Hogan & Hartson, Washington, DC, George Vradenburg, III, Fox Inc., Los Angeles, CA, for Fox Broadcasting Co.

Richard R. Zaragoza, Fisher, Wayland, Cooper & Leader, Washington, DC, for FBC Television Affiliates Ass'n.

Charles J. Sennet, James E. Cushing, Jr., Tribune Co., Chicago, IL, for Tribune Broadcasting Co.

George H. Shapiro, Marilyn D. Sonn, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Chris Craft Television, Inc., and United Television, Inc.

Diane S. Killory (argued), Linda Calhoun, Susan H. Crandall, Michael R. Gardner, Charles R. Milkis, W. Stephen Smith, Morrison & Foerster, Washington, DC, for Coalition To Preserve the Financial Interest and Syndication Rule.

Before POSNER, Chief Judge, and FAIRCHILD and BAUER, Circuit Judges.

POSNER, Chief Judge.

In 1970, the Federal Communications Commission issued "finsyn" (financial interest and syndication) rules designed to limit the power of the then three television networks (CBS, NBC, and ABC) in the market for television programs. The rules were upheld in *Mt. Mansfield Television, Inc. v. FCC,* 442 F.2d 470 (2d Cir.1971). The Commission issued revised finsyn rules in 1991, which the networks challenged in this court. We vacated those rules because the Commission had failed to address the objections that the networks had lodged against them. *Schurz Communications, Inc. v. FCC,* 982 F.2d 1043 (7th Cir.1992). On remand, the Commission decided to jettison most of the restrictions on the networks immediately and the rest two years after an antitrust consent decree against the three networks was lifted. The decree was lifted in November 1993, so the remaining restrictions will expire in November 1995. *In re Evaluation of the Syndication and Financial Interest Rules: Second Report and Order,* 8 F.C.C.R. 3282 (1993); *Memorandum and Opinion on Reconsideration,* 8 F.C.C.R. 8270 (1993). Petitions to review the Commission's decision have been filed by the three major networks, arguing that the Commission failed to articulate any rational basis for retaining any restrictions for any length of time, and by syndicators, producers, and independent stations, arguing that the "sunset" provision of the remaining restrictions should be stricken and those restrictions made permanent.

A television broadcast network consists of hundreds of individual television stations. Some are owned by the network itself, in the sense of the company (CBS, etc.) rather than the collectivity of stations. Most (the "affiliates") are independently owned. All are connected electronically to the network, enabling

simultaneous transmission of network programs to all the homes served by the stations making up the network. The network pays the affiliates a fee to carry its programs. The affiliates are not contractually obligated to take any of these programs, though they lose the transmission fee on any program that they decline to take from the network. Nor does the network attempt to (and it is not permitted to) supply the stations with their entire program needs. It concentrates on providing a full menu of "prime time" programming, that is, programming shown in the evening hours (7 to 11 or 6 to 10, depending on the time zone) that are the prime period for adult television viewing. A program shown in prime time over a television network provides advertisers with access to a huge market, enabling the network to charge them a price for advertising time that will cover the costs of producing or buying expensive programs and paying the affiliates to carry them. Until recently, it was unusual for an affiliate to refuse to carry the network's full schedule of prime-time offerings, but this pattern has changed, as we shall see.

Ostensibly in order to foster a richer and more diverse fare of news and entertainment than a market wholly dominated by three networks could be expected to provide, the FCC has, ever since the days of radio, been extremely solicitous of the welfare of independent stations, that is, stations not affiliated with a network. All three waves of finsyn rules have been designed to make sure that independent television stations have the resources to obtain popular programs from sources other than the networks, their competitors—from "independent" producers, in other words. The hope was that independent producers would supply an important part of the programming of independent stations, creating virile competition for network television. To protect the independent producer-distributor segment of the market from the networks, the original (1970) finsyn rules forbade the networks to "syndicate" (that is, sell) the programs that they produced to independent stations. The networks could sell the programs to an independent syndicator (for example, a producer), which would resell to independent stations, but they could not deal directly with independent stations. If the network had bought the right to exhibit the program rather than produced it itself, it could not buy syndication rights or retain any other form of financial interest in the program after it was broadcast over the network.

The stated reason for these protectionist restrictions was the peculiar dependency of the independent stations on *network* programs. Even though by definition the independent stations were not affiliated with any of the networks, much of these stations' most profitable programming consisted (and consists) of reruns of comedic or dramatic series that had had long, successful runs on a network during prime time. The independents purchase the rerun rights and then "strip" the series, meaning that the station airs five episodes a week of a series that originally had aired only once a week. Only the most successful prime-time series—ones that run for several years or more—generate enough episodes to support a rerun of reasonable length, so only a few series are usable for rerun purposes. Independent stations like to show the network reruns just before prime time, in the hope of attracting viewers who, once tuned to the station, will remain tuned for the station's prime-time offerings, when competition from the networks is most intense.

It may seem odd that rerunning a network series would be thought to contribute to diversity rather than monotony in television programming. But the Commission's thinking was that the reruns were essential to the independent stations' obtaining enough revenue to support their original programming (such as local news and weather) and to buy programs from independent producers. This, too, is changing, as we shall see.

The independent stations feared that if networks were allowed to syndicate their own first-run prime-time programs, they would refuse to syndicate them to independent stations—that is, refuse to sell rerun rights to those stations—in order to weaken the competition of the independents. And likewise if the networks were allowed to buy syndication rights in other programs that the independents might want to broadcast. In

either case, it was feared, the networks would syndicate the programs just to their affiliates.

It is doubtful whether these fears ever had much basis. If a network refused to sell broadcast rights to willing buyers—especially to its *most* willing and eager buyers, for the independent stations emphasize their dependence on network reruns—it would lose revenues, thus sacrificing a bird in the hand for a speculative bird in the bush consisting of a possible weakening of competition from independent stations. And the benefit of that weakening would enure to all the networks, not just to the one that had made the sacrifice. By preventing the networks from buying syndication rights, moreover, the rules deprived television producers of a potential source of financing, an important consideration in the case of a product as uncertain of success as a television series. Most series flop, or at least do not run long enough to generate sufficient episodes to support successful syndication. The few that make money do so precisely by being successfully syndicated to independent stations (and also network affiliates) as reruns. If networks could buy syndication rights, the risk of loss from failing to score the rare success that enables successful syndication would be shifted from the producer to a larger, more diversified entity presumptively better able to bear it. And the networks would be unlikely to sew up all the good programs in this way and deny the independent stations access to them. Since so few first-run programs prove "syndicable," the networks would have to pay a great deal for syndication rights to be confident of obtaining control over the programs desired by the independent stations, and they could not recoup the expense if they refused to sell to independents. It is no surprise that before the first finsyn rules were adopted in 1970, networks had rarely bought syndication rights in the programs that they purchased for network exhibition; however, the market for syndication was smaller then.

By 1991, when the Commission took its second stab at finsyn rules (really its third, because, as discussed in our previous opinion, in 1983 the Commission had announced, but never carried through, its intention to relax the 1970 rules), its fears about the consequences of unleashing the networks to compete with independent producers, syndicators, and stations had become almost entirely chimerical. The three networks, battered by the growth of cable television and the videocassette, and by the creation of a fourth broadcast network (Fox)—developments that confronted the three original networks with greatly intensified competition for television viewers—no longer had a monopoly of popular programs. Producers, moreover, had begun creating popular first-run programming for independent stations, decreasing those stations' dependence on network reruns. So popular was this programming that network affiliates now were sometimes bumping some of their own network's prime-time offerings in favor of programs produced by independent producers. Nor did the independent stations—their weak UHF signals brought to parity with VHF by cable television—seem as vulnerable to the competition from network-owned and -affiliated stations any more. And the number of independent stations had greatly increased, which was further evidence of their competitive vitality, while at the same time, contrary to the stated aim of the finsyn rules of increasing programming diversity, the market for the production of prime-time television programs had become concentrated in a handful of Hollywood studios, firms sufficiently large and diversified to bear the risks that the finsyn rules prevented producers from shifting to the networks.

Despite all these changes in the television industry, the revised rules that the Commission issued in 1991 and that we set aside, while ostensibly relaxing the original rules, continued to impose onerous restrictions on the program activities of networks, defined as suppliers of more than 15 hours a week of prime-time programming to owned and affiliated stations reaching at least 75 percent of U.S. households. The rules provided that no more than 40 percent of a network's prime-time entertainment programs could be produced by the network itself. They imposed procedural obstacles that made it virtually impossible for a network to buy domestic syndication rights to prime-time programs.

They forbade the networks to buy syndication rights in any programs not intended to begin life as network programs but instead as first-run programs shown by independent stations, or by network affiliates in lieu of network programming. They forbade the networks to "warehouse" programs, that is, to hold off selling rerun rights beyond the point the Commission thought adequate to exploit a program's first-run potential. *Schurz Communications, Inc. v. FCC, supra,* 982 F.2d at 1047–48.

In our review of the 1991 rules we pointed out that the Commission had failed to answer the principal objections to them. While purporting to liberalize the 1970 rules, it had failed to show that the new rules, on balance, were less rather than more restrictive than earlier ones, which for example had not limited the amount of prime-time programming that the networks could produce themselves. The Commission had also failed to show how limiting the acquisition of syndication rights would strengthen the independent producers. For it had not explained why, if the networks had monopsony power enabling them (unless forbidden) to extract syndication rights that would deprive the producers of profit opportunities in the rerun market, they would not, if forbidden to buy such rights, exercise their power by refusing to pay a "fair" price for first-run rights in the producers' programs, making the producers just as badly off— worse off if the risk-shifting point was valid. The Commission had failed also to explicate the logic behind a definition of "network" calculated to discourage Fox, which at the time was supplying its network stations with just under 15 hours a week of prime-time programming, from increasing its supply of programs (as it could easily do because it owned the huge Twentieth Century Fox film library), which would enlarge the program market and so provide more competition for the three major networks. The 1991 rules were a crazy quilt. Or so it seemed. For we did not decide that the Commission could not adopt such rules, only that it had failed, by its failure to address the principal objections that the networks had made to the rules, to show that the rules were rational.

■■ On remand the Commission did not attempt to offer a more convincing rationalization for the 1991 rules, or tinker with them around the edges, though either would have been a predictable response. Instead it threw out the rules, convinced that the objections to them were unanswerable. Except for reporting requirements which concern no one, the Commission decided that as of (as it has turned out) November 1995 there will be no finsyn rules. The networks will be free to compete in the television program market on terms of complete equality with the independent producers and syndicators. It is a remarkable about-face for an agency that for half a century has treated the independent television stations as sensitive plants requiring high fences to keep out network predators. The independent producers and stations argue that the Commission could not lawfully reverse course in this manner without more explanation than it gave. And it is true that an administrative agency unlike a legislature is not permitted to change course without explaining why it is doing so. See *Schurz Communications, Inc. v. FCC, supra,* 982 F.2d at 1053, and cases cited there. But these parties are wrong to argue that the Commission had to explain why it agreed with the criticisms of the 1991 rules made in our previous opinion. If it believed that the reasoning underlying the rules had been erroneous, it had to say why; that is true; but rather than set forth its reasons at length it could say, as in effect it did, "for the reasons set forth in the Seventh Circuit's opinion." It did not have to add, "because those reasons are sound." Administrative agencies, like courts, are generally in the position of choosing between competing positions rather than creating new positions *ex nihilo.* If a party puts forth a convincing case, the agency or court can adopt it, and the soundness of the result will depend on the soundness of the case as the party presented it. If as happened here (and not only here—see, e.g., *Graphic Communications Int'l Union v. NLRB,* 977 F.2d 1168 (7th Cir.1992)) an agency is persuaded by a court's reasoning to alter its course, it can adopt that reasoning, and then the adequacy of the agency's new position will depend on the adequacy of the adopted reasoning.

The quarrel of the independent producers and stations, therefore, is not with the Commission, but with our previous opinion, which furnished a rationale for deregulation that the Commission has adopted. Yet they have not taken direct issue with any of the central points in that opinion. Their argument is not that the opinion was wrong, but that the Commission could not adopt the reasoning of the opinion without explaining *why* it was adopting that reasoning. The only answer the Commission could have given, however, was the one it did give—that it agreed with the opinion. Whether this was a rational response depends only on whether the reasoning in our previous opinion was rational. We are given no reason to suppose that it was not.

■ The networks mount the more powerful attack on the Commission's new decision. They argue that there is no reason to retain for however short a period any restrictions on the networks' activities in the program market. To evaluate their argument we must first describe the restrictions that the Commission has imposed during the interim period that is to end in November 1995 with complete finsyn deregulation. They are threefold. First, while the three major networks are free to buy (or retain) syndication rights or other financial interests in any programs shown on the network, they may not exercise those rights directly, that is by negotiating the sale of rerun rights to individual stations. The actual negotiations must be conducted by independent syndicators. This first restriction applies whether or not the network produced the program in question, but the second and third restrictions apply only to programs produced by others. The second is that the three major networks may not buy syndication rights or other financial interests in programs intended to have their first run on independent stations or network affiliates rather than as network programs. And third, the three major networks must make any prime-time programs for which they own the syndication rights available for syndication within four years of the program's network debut or six months after the network has completed its network run, whichever is earlier.

No restrictions are imposed on the Fox network. The new rules define an "emerging network" as one that did not meet the criteria for a network set forth in the 1993 rules in 1993 but has met them since, and exempt emerging networks from all finsyn restrictions.

Although the interim restrictions are to expire in November 1995, six months before then the Commission will institute a new proceeding, to determine whether any of the restrictions should be continued or other restrictions imposed. In that proceeding the burden of persuasion will be on anyone advocating continued restrictions on the networks.

The main purpose of the interim restrictions is to give the independent stations temporary protection of the independence of their program supply from the networks. A secondary purpose is to give the independent producers an opportunity to form their own networks if they want to have distribution systems that are wholly independent of the existing networks, their competitors, which with the expiration of the remaining restrictions will no longer be handicapped in competing with the independent producers. The networks have now been liberated to own syndication rights in any program shown on the network, but under the interim rules a network may not exercise those rights to deny the program to an independent station when the program is ripe to be rerun; the decision whom to syndicate the network's programs to will be that of independent syndicators. By the second restriction the networks are effectively excluded from buying programs from independent producers for syndication, and by the third (which is closely linked to the second) they are forbidden to hold off the rerun market shows that have either completed their first run or are having such a long first run as to be "ready" to be rerun even though the first run has not been completed. This restriction is by its nature applicable only to programs in which the networks have syndication rights as well as first-run rights, since if a network lacked syndication rights it could not control the timing of the rerun in any event.

These restrictions strike us as rather small beer when their temporary status—only sixteen months to go before they expire—is considered. Assuming, as we have been given no reason to doubt, that there is a competitive market in the administration of syndication rights, that is, in negotiating with individual stations over the terms on which they will be permitted to rerun a program, the networks should be able to retain independent syndicators to perform this function at approximately the same cost at which they could perform it themselves. If there are substantial economies to bringing this marketing function in house, they certainly were not laid out in the record before the Commission. The second restriction basically just postpones for some months the networks' entry into a business distinct from though related to network television, namely that of syndicating programs bought from independent producers. This activity would represent diversification for the networks, but with what benefits social or private the record is again silent. As for the "anti-warehousing" restriction, it may prevent the networks from maximizing their copyright revenues (just as if publishers were forced to publish the paperback version of any best seller within a fixed time after the publication of the hardcover edition), but it applies only to those prime-time programs in which the network has syndication rights. Until the new rules went into effect in March of last year, networks were not allowed to acquire such rights in their prime-time programs, so the restriction is applicable only to programs in which the networks will have acquired syndication rights over the two-and-a-half-year period between the adoption of the new rules and their expiration, plus programs that the networks produce in house. The impact on network operations seems slight but in any event has not been assessed in the record before us, most of which consists of the same dreary, argumentative, repetitive, canned, self-serving submissions that were in the original record. The post-remand record is sparse, again largely argumentative, and does not provide a persuasive empirical basis for any of the parties' contentions.

With the rapid growth of the Fox network—its well-publicized "raid" on CBS, which netted it eight stations affiliated with that once-mighty network (Fox already having wounded CBS by wresting NFL football broadcast rights from it), occurred since the Commission's adoption of the interim restrictions—the exemption of Fox from these restrictions increasingly seems arbitrary. But the other networks do not argue that the exemption should be eliminated—only that it shows the arbitrariness of the restrictions on themselves. Evidently they do not fear that the exemption will enable Fox to obtain a substantial competitive edge over them. This is indirect but telling evidence that the restrictions are minor impediments to the major networks' competitive plans.

Rather than try to show that the interim restrictions really pinch, the networks have been content to argue that they are gratuitous; however small the cost, the benefit is zero. They do argue that the cost, if not to them, then to society, is great because the restrictions foster the continuing trend toward concentration of television program production in the hands of a small group of giant Hollywood studios, to the detriment not only of competition in the economic sense but of freedom of expression. But it is again all words. The production market is oligopolistic in the sense that a few firms have most of its sales, but it is many years since anyone knowledgeable about antitrust policy thought that concentration by itself imported a diminution in competition, let alone in the values that the First Amendment (the limited application of which to broadcast television has just been reaffirmed, *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, —— ——, 114 S.Ct. 2445, 2453–57, 129 L.Ed.2d 497 (1994)) is designed to protect. It is inconsistent for the networks to disparage the "leverage" and "foreclosure" theories that the independents use to criticize the Commission's rules for being too lax, while at the same time invoking the equally tenuous antitrust bogeymen of "oligopoly" and "concentration" to criticize the rules for being too severe.

The main complaint of the networks lies, in any event, elsewhere. It lies in pointing out

that the premise of the Commission's decision is that the nation does not need any finsyn rules, and that the only, and trivial, reason the Commission gave for not abrogating them immediately is that it is afraid that the theoretical analysis which it adopted from our previous opinion may be wrong.

Well, it may be; and caution in overturning a regulatory system that has been in place for many years strikes us as an adequate reason for an agency's deciding to continue the system in limited form for a brief period before decreeing total deregulation. Phased deregulation is common, practical, and sensible. Involving as it does judgmental considerations that are difficult to quantify, it is unlikely to flunk judicial review. See *MCI Telecommunications Corp. v. FCC*, 750 F.2d 135, 141–42 (D.C.Cir.1984); *Rural Telephone Coalition v. FCC*, 838 F.2d 1307, 1316 (D.C.Cir.1988). Even in their weakened state, the three major networks are an important source of supply of programs for the independent stations with which the networks compete for viewers. Although there are no convincing theoretical reasons, in the present understanding of antitrust policy, for expecting the networks to withhold programming from the independent stations in order to weaken them competitively, as by purchasing syndication rights and then refusing to syndicate to independent stations, the possibility exists and we cannot say that the Commission is being irrational in appealing to it to justify limited and temporary restrictions on the networks' competitive freedom. If the costs to the networks were very great, the Commission's concerns, being speculative, would be overborne. But, as we have been at pains to emphasize, the networks have made no attempt to show that the costs are very great, or even substantial. Arguments phrased in generalities are less impressive than empirical data quantifying the adverse impact of a challenged rule. *Morales v. Yeutter*, 952 F.2d 954, 960 (7th Cir.1991). The restrictions challenged here are pesky, irksome, anachronistic, and a product perhaps of undue timidity; they reflect a persistence of protectionist thinking that the Commission itself has discredited; they will transfer some wealth away from the networks, perhaps gra-

tuitously. But we cannot say that they are irrational.

We suspect that the networks' real concern is not with the interim restrictions at all, but with the possibility that in the administrative proceeding that is to begin six months before the expiration of the restrictions the Commission (three of whose five members are new since the decision under review) may change its mind about deregulating the television program market. But if it does so, it had better have an excellent, a compelling reason. The three original networks are even weaker today than they were in March of last year when the decision to deregulate was made, and no doubt they will be weaker still next year when the new proceeding is to commence.

■ The responsibility for regulating (or deregulating) the market in television programs is the FCC's, not ours. The precise timetable on which the Commission executes a major turn in regulatory policy is a matter of judgment and prudence rather than of logic and measurement, and it is confided to the discretion of the Commission within broad limits not here exceeded. We might have preferred and certainly would not have forbidden an immediate rescission of restrictions whose mismatch with the current situation in the broadcast industry becomes more evident by the day. But we cannot pronounce the agency arbitrary and capricious for deciding to proceed in a more cautious manner that will enable it to observe the operation of a partially deregulated market before allowing deregulation to become complete. The television industry is changing so rapidly that we cannot exclude the possibility that the interim restrictions will come to seem irrational before they are due to expire. In that event, however, the parties would be free to ask the Commission to modify or abrogate the restrictions ahead of schedule. We need not decide what judicial recourse the networks might have if the Commission refused. The issue is hypothetical.

The petitions to review are

DENIED.